## THE GARONNE.

(Circuit Court of Appeals, Ninth Circuit. February 10, 1908.)

1. MARITIME LIENS—CONTRACTS CREATING LIENS—OWNER PRO HAC VICE.

The owner of a vessel who delivers her to a purchaser under a contract of sale makes such purchaser the owner pro hac vice, and must be deemed to have assented to his creating liens on the vessel as security for the performance of contracts of affreightment and for maritime service.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 26.]

**2. SAME—CONTRACT FOR MARITIME SERVICE—LIGHTERAGE.**

A contract with the owner for the lighterage of cargo and passengers from a vessel moored at a distance from the land is essentially one for a maritime service, for a breach of which the lighterage contractor is entitled to a lien on the vessel, and such lien is not affected by any private agreement between the owner and the owners of cargo that lighterage should be at the expense and risk of the latter.

**3. SAME—CONTRACT OF AFFREIGHTMENT—LIEN FOR BREACH.**

There is no lien on a vessel for breach of a contract of affreightment unless the goods are delivered to the ship or to some one authorized to act for her, nor can there be a lien for the cost of making such delivery, although the goods after being received are not carried.

Appeal from the United States District Court, for the District of Alaska, Second Division.

In February, 1904, Frank Waterhouse & Co., owning the steamer Garonne, made a contract with W. H. Ferguson, representing the North Alaska Steamship Company, to sell the steamship to that company for the sum of $85,000. The purchaser paid $1,000 cash, and agreed to pay $14,000 on February 15, 1904, at which time a bill of sale of the vessel was to be given and the vendor was to receive notes for the remainder of the purchase price, secured by a mortgage on the vessel, the insurance thereon, a bond that the purchaser would keep the vessel free of liens until fully paid for, and other collateral security satisfactory to the vendor. The $14,000 payment was made on February 15th, but the purchaser being unable to furnish the securities called for by the contract, the time for the further performance of the contract was extended to March 15th, and was again extended to June 3, 1904. In the meantime the purchaser was making repairs on the vessel, supplying her for a voyage to Nome, and engaging cargo for the first voyage, which was to begin about June 2d. When the ship was ready for this voyage, the purchaser was still in default, and unable to furnish the securities called for by the contract. It then agreed with the vendor that, if it would allow the first voyage to be made, the purchaser would turn over to it $18,000 of the passenger and freight money receipts, to be credited on the purchase price, and in payment of certain supply bills, and that the purchaser would, immediately after the departure of the vessel, make full payment from its New York office, of the balance due the vendor, in default of which the latter was to be entitled to take possession of the vessel as soon as the voyage ended. The steamer sailed from Seattle on or about June 3d, but the remainder of the purchase price was not paid, and when the vessel returned from Nome in July, the owner took possession thereof, canceled the contract, and subsequently sold her to the Merchants' & Miners' Steamship Company, the appellant in this case. On May 16, 1904, the North Alaska Steamship Company made a contract with the appellee Jorgenson to carry certain cargo to Nome for him, and engaged him to do certain lightering for the company at Nome and other points. After the vessel had been transferred to the appellant, the appellee libeled her for alleged breaches of the contract so made between him and the North Alaska Steamship Company. The appellant made claim to the vessel and answered the libel. A decree was entered in the court below in favor of the appellee against the appellant and the sureties on its release bond for the sum of $3,612.95. From that decree the present appeal is taken.

W. H. Bogle, Charles P. Spooner, Dudley Du Bose, H. Y. Freedman, and Thos. R. Shepard, for appellant.

Ira D. Orton, Geo. A. Schofield, Campbell, Metson, Drew, Oatman & Mackenzie, and E. H. Ryan, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). It is contended that there was error in allowing the appellee the sum of

$291.65, the first item in the libel adjudged to be due him on the contract of lighterage made on May 16, 1904, and that the amount due on that contract is not a lien against the ship in the hands of the present owner. But the owner allowed the North Alaska Steamship Company to have the entire control, management, and employment of the vessel, and to become the owner pro hac vice. In such a case the general owner must be deemed to consent that the special owner may create liens binding on the former's interest in the vessel as security for the performance of contracts of affreightment and for maritime service. The Schooner Freeman v. Buckingham et al., 18 How. 182, 15 L. Ed. 341. And a contract for the lighterage of freight and passengers from a vessel moored at a distance from the land is essentially a contract for a maritime service. Thackeray v. The Farmer, Gilp. 526, Fed. Cas. No. 13,852; Benedict's Admiralty, § 158. The appellant denies that there is a lien, for the further reason that the North Alaska Steamship Company contracted with all shippers of cargo on that voyage that their goods should be received by the owners thereof at ship's tackle immediately on arrival at the port of delivery, and that if the consignee were not on hand to receive the goods as discharged, then the carrier might deliver the same to the wharfinger or other person believed by the carrier to be responsible, who should take charge of said property, pay freight on the same, or the same might be kept on board the vessel, or stored in hulks or in lighters by the carrier at the expense and risk of the owner, shipper, or consignee. It is claimed that by virtue of this agreement, so stipulating that lighterage shall be at the expense and risk of the consignees, no duty was imposed on the ship to pay for lighterage, and that therefore the contract of the North Alaska Steamship Company with the appellee was a personal contract made on the credit of that company, for the breach of which there is no lien upon the ship. We cannot see that the contract made between the carrier and the shippers of freight has anything to do with the question of the appellee's lien under his contract of lighterage. That was a maritime contract for a breach of which the appellee had a lien upon the vessel. He was not a party to the agreement between the carrier and the shippers, and his rights are in no way affected by the fact that the carrier saw fit to recoup the expense of lighterage from the owners or consignees of the goods.

The appellant contests the allowance of $475 and $150 as sued for in the second and third causes of action. All of these charges arose out of the service of lightering the vessel. $425 was for lightering at Golovin Bay, a service which was not included in the original contract. But the ship had cargo to deliver there, and the agent of the North Alaska Steamship Company engaged the services of the appellee and promised to furnish him lighters there for the work. He did not have the lighters there. In consequence, the appellee was required to use his steam scow at his own expense, and, upon the evidence in the record, we can discover no error in the allowance of $425 for that service. In addition to that there was $20 charged for the detention of the appellee's lighters while lightering lumber which was to go up Solomon river. The agent of the ship had the lumber taken off where the water was too low. The lighters got stranded on the

bar, and, for the resulting delay, the agent agreed to pay the appellee. Thirty dollars was for carrying freight from Nome to a bark at Golovin Bay. The $150 item was for demurrage for the detention of the appellee's lighters at Lane's Derrick. The ship's agent insisted that the appellee should take the scow into Lane's Derrick while the water was very low, and agreed to pay for demurrage in the sum of $150 if there was detention of the same. All these items were, according to the testimony, subsequently presented to the agent, and were approved by him. We find no error in their allowance by the court below.

One of the items allowed in the decree is $250, wharfage paid by libelant to the Chesley Wharf, on the lighter which the North Alaska Steamship Company agreed to carry on the Garonne, and which it did not carry. By the contract of May 16th, the steamship was to carry the lighter, which had been constructed at the Chesley Wharf, and certain knock-down scows which were also lying on that wharf, and it was understood that the steamship was to be brought to that wharf from its dock three-quarters of a mile distant, in order to take said property on board. The steamship could not carry out its part of the agreement, and refused to carry the lighter on that voyage. When this was known, the appellee caused the knock-down scows to be hauled from the Chesley Wharf and delivered to the steamship at her dock, but there was no actual delivery of the lighter to the steamship, or to her master, or to any authorized agent or officer. The testimony of the appellee on that subject is that, in a conversation which he had with Ferguson just before the steamship sailed, the latter promised that he would bring the lighter on the next trip of the Garonne, and in answer to the question as to what was said at that time with reference to taking charge of the lighter, the appellee answered, "He said that Hastings would attend to it—that he would be down there when we left, and he would take charge of her." Hastings was the assistant traffic manager of the North Alaska Steamship Company, and he testified that all he knew about the lighter was that he understood that there was some agreement between Ferguson and the appellee about the delivery of the same, but as to the details of the transaction he was not informed. There was no evidence that he or any agent or officer of the steamship company ever took possession of the lighter. Under the general maritime law, the contract of affreightment of the lighter created no lien on the vessel unless there was a delivery. "The reception of the goods by the master on board of the ship or at a wharf or quay near the ship for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, or seeming to have this authority by the action or assent of the owners or master, binds the ship to the safe carriage and delivery of the goods." 1 Parsons, Shipping & Admiralty, 183. The evidence fails to show that the appellee ever parted with the possession of the lighter. The promise of Ferguson that he would send Hastings to take charge of her for the purpose of keeping her and sending her on the next voyage of the ship, a promise which was not fulfilled, was not a delivery to the ship. Guffey v. Alaska & P. S. S. Co., 130 Fed. 271, 64 C. C. A. 517, and cases there cited. The item of $250, therefore, charged for wharfage of the

lighter, and $1,000 damages for the loss of the use of the same during the season at Nome, can constitute no charge against the ship, and must therefore be disallowed.

As to the material of the knock-down scows, the evidence sustains the finding of the court below that it was delivered to the vessel at its dock. The expense of $46.40, for hauling the same, however, is no charge upon the ship, and must be disallowed. But we perceive no reason why the ship is not chargeable with the sum of $446.30 allowed by the court below as damages for the failure of the vessel to carry a portion of said material after receiving the same at its dock.

The decree of the court below will be modified in accordance with the foregoing views, and a decree will be entered for the appellee in the sum of $2,316.55, and costs allowed by the court below, but without costs in this court.